UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JASMINA SKOKIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21 CV 1086 ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff Jasmina Skokic brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Skokic's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and remanded.

# I.   Procedural History

Skokic filed her applications for benefits on September 27, 2016.   (Tr. 138-54.)   She claimed she became unable to work on September 1, 2010, due to major depression, memory loss, vision problems, nerve damage to her right arm, pain and numbness in her right leg, and vertigo.   (Tr. 174.)   Skokic was 39 years of age at her alleged onset of disability date.   Her applications were denied initially.   (Tr. 74-80.)   Skokic's claim was denied by an ALJ on December 5, 2018.   (Tr. 12-26.)

Following the Appeals Council's denial (Tr. 1-4), Skokic appealed the ALJ's denial to the United District Court for the Eastern District of Missouri.   On September 18, 2020, the Honorable Shirley Padmore Mensah, United States Magistrate Judge, reversed and remanded the decision for further proceedings.   (Tr. 765-79.)   Specifically, Judge Mensah found that the ALJ failed to properly weigh the opinions of Skokic's treating mental health providers.   On May 3, 2021, after a second administrative hearing, the same ALJ found Skokic was not disabled.   (Tr. 688-704.)   Thus, this second decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Skokic first argues that the decision of the ALJ "fails to properly evaluate Dr. Marcu's opinion."   (Doc. 22 at 3.)   She next contends that the ALJ's evaluation of Skokic's counselor, Maggie Santinanavat, LCSW, is lacking for the same reasons.   *Id.* at 5-6.   She further argues that the decision "lacks a proper evaluation of Plaintiff's subjective complaints/reports of symptoms."   *Id.* at 6.   Finally, Skokic contends that "the RFC is not supported by substantial evidence."   *Id.* at 11.

## II.  The ALJ's Determination

The ALJ first found that Skokic met the insured status requirements of the Social

Security Act through March 31, 2015.   (Tr. 693.)   She stated that Skokic has not engaged in

substantial gainful activity since her alleged onset of disability date.   *Id.*   In addition, the ALJ

concluded that Skokic had the following severe impairments: major depressive disorder, post-

traumatic stress disorder ("PTSD"), and glaucoma.   (Tr. 694.)   The ALJ found that Skokic did

not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments.   (Tr. 695.)

As to Skokic's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but with the
> following nonexertional limitations: the claimant can occasionally
> climb ladders, ropes or scaffolds.   The claimant should avoid
> hazards such as unprotected heights and moving mechanical parts.
> The claimant is able to complete simple, routine tasks with
> minimal changes in job duties and job setting.   The claimant
> should avoid fast-paced production work.   The claimant can have
> occasional interaction with supervisors, coworkers and the general
> public.

(Tr. 697.)

The ALJ found that Skokic was unable to perform any of her past relevant work, but was

capable of performing other jobs that exist in significant numbers in the national economy.   (Tr.

702.)   The ALJ therefore concluded that Skokic was not under a disability, as defined in the

Social Security Act, from September 1, 2010, through the date of the decision.   (Tr. 703.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on September 27, 2016, the

claimant is not disabled under sections 216(i) and 223(d) of the
Social Security Act.

Based on the application for supplemental security income
protectively filed on September 27, 2016, the claimant is not
disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.   Applicable Law

### III.A.   Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and

non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a  proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice."   *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."   *Page v.*

*Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is

other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must

determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Skokic first argues that, in determining Skokic's RFC, the ALJ failed to properly evaluate the opinion of treating Psychiatrist Mirela Marcu, M.D.   She next contends that the ALJ's evaluation of Skokic's counselor, Maggie Santinanavat, LCSW, is lacking for the same reasons. As discussed below, these errors resulted in the formulation of an RFC that is not supported by substantial evidence.[1]

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v.*

---

[1]Because these issues are dispositive, the Court does not reach Skokic's additional argument that the ALJ erred in evaluating her subjective complaints.

*Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

The ALJ found that Skokic had the mental[2] RFC to complete simple, routine tasks with minimal changes in job duties and job setting; she should avoid fast-paced production work; and she can have occasional interaction with supervisors, co-workers, and the general public.   (Tr. 697.)   In making this determination, the ALJ evaluated the medical opinion evidence.

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including her symptoms, diagnoses, and prognoses; what she can still do despite her impairments; and her physical and mental restrictions.[3]   20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2017).   The Regulations require that more weight be given to the opinions of treating sources than other sources.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   A treating source's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).   This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from

---

[2]Although Skokic also alleged disabling physical impairments, her arguments focus on her mental impairments.   As such, the undersigned will only discuss the medical evidence regarding Skokic's mental impairments.

[3]In March 2017, the Social Security Administration amended its regulations governing the evaluation of medical evidence.   For evaluation of medical opinion evidence, the new rules apply to claims filed on or after March 27, 2017.   *See* 20 C.F.R. §§ 404.1520c, 416.920c. Because the claims under review here were filed before March 27, 2017, the Court will apply the rules set out in 20 C.F.R. §§ 404.1527 and 416.927.

the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating source's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord that and any other medical opinion of record, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the source provides support for their findings, whether other evidence in the record is consistent with the source's findings, and the source's area of specialty.   20 C.F.R. §§ 404.1527(c), 416.927(c).   The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Dr. Marcu completed a Mental Medical Source Statement on July 5, 2018, in which she indicated she had diagnosed Skokic with major depressive disorder, severe, recurrent; PTSD; and neurocognitive dysfunction.   (Tr. 469.)   Dr. Marcu expressed the opinion that Skokic had extreme limitations in her abilities to follow one or two-step oral instructions to carry out a task and function independently; and marked limitations in her abilities to initiate and complete tasks in a timely manner, ignore or avoid distractions, sustain ordinary routine and regular attendance, and keep social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness.   (Tr. 466-68.)   Dr. Marcu found that Skokic's overall pace of production performing simple tasks in a low-stress environment would be 31 percent or more below average; and she would miss work three times a month or more due to her psychologically-based symptoms.   (Tr. 466-67.)   Dr. Marcu further found that Skokic could not perform in proximity to coworkers without being distracted by them or without distracting them due to exhibition of abnormal behavior; could not consistently perform for superiors without exhibiting insubordinate

behavior in response to supervision; and could not perform in a setting with any contact with the general public.   (Tr. 468.)   She expressed the opinion that the limitations assessed existed prior to Skokic's treatment with Dr. Marcu.   (Tr. 469.)

The ALJ indicated that she was according "little weight" to Dr. Marcu's opinion, "as the severity of the limitations opined are not consistent with the record."   (Tr. 700.)   She stated that Skokic's major depressive disorder and PTSD "have caused no more than moderate limitations." *Id.*   The ALJ acknowledged some of the abnormal findings on examination, such as impaired memory and recall, anxious and depressed mood, panic attacks, impaired concentration, auditory hallucinations, passive suicidal ideations, and impaired judgment and insight.   She stated that Skokic was nevertheless able to perform within the above RFC.   *Id.*   The ALJ provided the following explanation for her finding:

> The claimant was consistently alert and oriented.   She demonstrated average intelligence and fund of knowledge.   The claimant also routinely had a normal memory.   Additionally, the claimant was cooperative.   At times, she had a normal mood and affect.   Her providers also noted the claimant was well engaged.   On occasion, the claimant had intact attention and concentration. Moreover, the claimant has not sought inpatient or emergency mental health treatment.   The claimant denied having suicidal or homicidal ideations.   She also routinely denied having auditory or visual hallucinations.   The claimant also had a logical and goal directed thought process.   She consistently demonstrated good insight and judgment.   Therefore, the undersigned gives Dr. Marc's opinion little weight.

(Tr. 700-01.)

Skokic notes that Judge Mensah found that the ALJ, in her first decision, failed to give "good reasons, supported by substantial evidence, for the decision to discount or disregard the opinion of Dr. Marcu."   (Tr. 777.)   She argues that the ALJ in the instant decision similarly failed to provide good reasons for assigning "little weight" to Dr. Marcu's opinion.   Skokic contends that the findings cited by the ALJ in support of affording little weight to the opinion are

not inconsistent with Skokic's allegations of symptoms and limitations.   The undersigned agrees.

Dr. Marcu was the attending physician at the SLUCare Department of Psychiatry when Skokic received treatment there on at least five occasions from May 2017 through May 2018. (Tr. 520-26, 532-36, 569-73, 580-84, 604-19.)   It appears that Skokic's treatment was provided by resident physicians at most of Skokic's visits, under the supervision of Dr. Marcu.   *Id.*   The undersigned will summarize these visits below:

Skokic presented to SLUCare on May 25, 2017, with the assistance of an interpreter, for a new psychiatric evaluation.   (Tr. 521.)   Skokic was of Bosnian origin, and experienced trauma in the past from the Bosnian war.   *Id.*   She was currently taking Lexapro[4] and Amitriptyline.[5]   *Id.*   Skokic began seeing a psychiatrist six years prior due to panic attacks and had been on psychiatric medications off and on since that time.   *Id.*   Skokic had quit her last job as a nurse assistant six years prior because she "felt lost" and could not listen to people.   *Id.* Skokic lived with her husband and two adult children.   *Id.*   She reported difficulty sleeping due to nightmares, and indicated that she only slept about two hours a night.   *Id.*   Her energy, focus, and concentration were "not great," her pleasure was "poor;" her mood was "mostly down;" and she still experienced panic attacks.   *Id.*   On examination, Skokic appeared older than her stated age, exhibited intermittent eye contact, her speech was soft, she exhibited psychomotor retardation, her affect was sad, her mood was "not good," and she experienced phobias.   (Tr. 524.)   She was diagnosed with major depressive disorder ("MDD"), recurrent episode; panic

---

[4]Lexapro is indicated for the treatment of depression.   *See* WebMD, http://www.webmd.com/drugs (last visited September 16, 2022).
[5]Amitriptyline is indicated for the treatment of depression.   *See* WebMD, http://www.webmd.com/drugs (last visited September 16, 2022).

disorder; and rule out PTSD.   (Tr. 524-25.)   Skokic's Amitriptyline was continued, her Lexapro

was increased, Klonopin[6] was added, and it was noted that she might benefit from cognitive

behavioral therapy.   (Tr. 525.)

Skokic returned for follow-up on July 13, 2017, at which time she reported her sleep was

better but she still had sleep abnormalities; her mood was still very down; and she continued to

have crying spells and anxiety.   (Tr. 534.)   The examining physician noted that he suspected

some abuse at home, but Skokic did not want to talk about it.   *Id.*   On examination, Skokic was

restless, her affect was sad and restricted, her mood was "not good," and she reported phobias.

*Id.*   Skokic's Amitriptyline was stopped and she was started on Seroquel.[7]   (Tr. 535.)   It was

noted that she would benefit from therapy.   *Id.*

On October 8, 2017, Skokic was tearful, reported her sleep was poor because she was

afraid to fall asleep due to nightmares, she was depressed and tired during the day, and she

reported difficulties with memory and concentration.   (Tr. 542.)   Skokic indicated that she was

hoping she could "get better so she can go back to work."   *Id.*   On examination, she appeared

disheveled and older than her stated age, was tearful, and displayed a restricted affect.   *Id.*   She

strongly denied suicidal ideation.   *Id.*   Skokic reported that her husband was verbally (but not

physically) abusive.   (Tr. 545.)   She was diagnosed with MDD and PTSD.   *Id.*   Prazosin[8] was

added for nightmares, her Clonazepam was increased, and the rest of her medications were

continued.   *Id.*   Individual therapy was recommended.   *Id.*

---

[6]Klonopin is indicated for the treatment of panic attacks.   *See* WebMD,
http://www.webmd.com/drugs (last visited September 16, 2022).
[7]Seroquel is an antic-psychotic drug indicated for the treatment of conditions such as
schizophrenia and bipolar disorder.   *See* WebMD, http://www.webmd.com/drugs (last visited
September 16, 2022).
[8]Prazosin is indicated for the treatment of PTSD.   *See* WebMD, http://www.webmd.com/drugs
(last visited September 16, 2022).

On October 26, 2017, Skokic reported that her sleep was a little better the past two weeks, but she continued to experience issues with forgetfulness.   (Tr. 570.)   Her mood was depressed.   *Id.*   She was "maybe a little less" irritable and anxious, but some situations "put her over the edge."   (Tr. 570-71.)   Skokic became tearful when she discussed thinking about her past experiences.   (Tr. 571.)   Her nineteen-year-old son lived with her and her husband supported the household.   *Id.*   She stated that she last felt "normal" before her time in a concentration camp.   *Id.*   Skokic indicated that the Lexapro and Klonopin helped and the Prazosin helped "a little" with nightmares, but not completely.   *Id.*   The examining physician noted that psychomotor retardation and tearfulness were present on exam, and that Skokic was "quite depressed."   (Tr. 572.)   He increased her Prazosin and added Wellbutrin[9] for her depressive symptoms of low energy and poor memory/concentration.   *Id.*   Dr. Marcu remarked that Skokic "appears to have partial response to her meds, she continues to have depression, nightmares, poor sleep, anxiety, decreased memory and concentration."   (Tr. 573.)

On January 25, 2018, Skokic reported feeling "a little better overall" but felt "sad" because of her poor memory.   (Tr. 581.)   She indicated that she was hit in the head and beaten when in Bosnia and had had memory issues since the war.   (Tr. 582.)   Skokic reported that she occasionally forgets where she is going.   *Id.*   The examining resident indicated that Skokic's memory issues were likely due to depression, but he could not rule out a history of traumatic brain injury.   (Tr. 583.)   He increased the Wellbutrin and Prazosin, continued other medications, and referred her to neuropsychological testing to evaluate any cognitive deficits.

---

[9]Wellbutrin is indicated for the treatment of depression.   *See* WebMD, http://www.webmd.com/drugs (last visited September 16, 2022).

*Id.*  Dr. Marcu noted that Skokic reported some improvement, but continued to have symptoms of depression and PTSD.   (Tr. 584.)

Dr. Marcu completed her Mental Medical Source Statement on the same date as Skokic's January 25, 2018 visit.   (Tr. 465-68.)   Dr. Marcu indicated that her opinion was based upon the following objective signs and symptoms displayed by Skokic: severe depression, severe memory and concentration deficits, and an inability to function independently.   (Tr. 469.)   When asked about any other reasons Skokic may have difficulty working on a full-time sustained basis, Dr. Marcu responded: "severe deficits of functioning, memory and concentration, cannot take care of herself."  *Id.*

On May 10, 2018, Skokic reported that she was "not feeling well overall," and reported passive suicidal ideation.   (Tr. 606.)   She indicated that she experienced acute anxiety when visiting her son in the hospital after he was injured in a motor vehicle accident.  *Id.*   The examining resident found that Skokic's depressive symptoms and anxiety were acutely exacerbated in the context of her son's accident.   (Tr. 608.)   He increased her medications and advised her to undergo neuropsychological testing as soon as possible to evaluate her memory problems.  *Id.*

The Court finds that the ALJ failed to offer "good reasons" for assigning little weight to Dr. Marcu's opinion.   The examination findings cited by the ALJ in support of her decision to discredit the opinion are not inconsistent with Dr. Marcu's opinion.   For example, the fact that Skokic was alert, oriented, and demonstrated average intelligence has no impact on Skokic's ability to complete tasks in a timely manner, ignore distractions, sustain regular attendance, or interact socially.   Dr. Marcu's opinion that Skokic had an extreme limitation in her ability to follow one or two-step oral instructions to carry out a task was based on Skokic's "severe

memory and concentration deficits," rather than an intellectual deficit.   (Tr. 469.)   Dr. Marcu

consistently documented Skokic's difficulties with memory and concentration, as set out above.

She also documented Skokic's depressive symptoms of depressed mood, tearful affect, crying

spells, low energy, psychomotor retardation, and suicidal ideation.   Skokic also regularly

complained of difficulty functioning due to sleep disturbance, nightmares, panic attacks, and

phobias.   Skokic received regular psychiatric treatment at SLUCare and took multiple

psychotropic medications that were adjusted at each visit.   Although Skokic had a "partial

response to her meds," her serious symptoms persisted.   (Tr. 573.)   As Judge Mensah noted in

connection with the ALJ's first decision, Dr. Marcu's opinions appear to be "at least to a

significant extent, consistent with the treatment notes."   (Tr. 778.)

　　　　Moreover, medical evidence dated after the ALJ's first decision but prior to the second

decision reveals Skokic continued to experience significant psychiatric symptomatology.   On

January 21, 2019, Skokic reported to a resident physician at SLUCare that she had experienced a

"panic attack," during which she woke up in her daughter's car when her daughter was running

errands and did not know where she was or how she got there.   (Tr. 934.)   She endorsed passive

suicidal ideation without any plan or intent, and also reported self-harming behavior such as

superficially cutting her arm to "ease tension."   *Id.*   The resident noted that Skokic continued to

struggle with depressive symptoms and anxiety, and was having increased periods of anxiety that

are correlated to her fear of memory loss.   (Tr. 936.)   He increased her dosage of Klonopin.

*Id.*   In May 2019, Skokic continued to have periods of crying spells, bursts of irritability, and

felt that her memory was getting worse.   (Tr. 959.)   She denied any active suicidal ideations,

but continued to have passive suicidal ideation.   *Id.*   In January 2021, Skokic was not doing

well.   (Tr. 982.)   She had lost her insurance and was not taking any medications.   *Id.*   Skokic

indicated that she was cutting herself "to see blood and feel better."   *Id.*   She was also hearing

voices.   *Id.*   Skokic was assessed with MDD with psychotic features; and PTSD.   (Tr. 986.)

Her medications were resumed, including an additional medication for psychotic symptoms.   *Id.*

In sum, the ALJ erred in discrediting Dr. Marcu's opinions due to their alleged

inconsistency with the record.   Dr. Marcu consistently noted the presence of severe depressive

symptoms, PTSD symptoms, and deficits in attention and concentration, even with medication

compliance.   The ALJ's finding that Skokic's impairments resulted in no more than moderate

limitations lacks the support of substantial evidence.

The ALJ next discussed the opinion of Ms. Santinanavat.   (Tr. 701.)   Ms. Santinanavat

completed a Mental Medical Source Statement on July 5, 2018, in which she indicated that

Skokic had been diagnosed with MDD, severe, recurrent; and PTSD.   (Tr. 657.)   Ms.

Santinanavat expressed the opinion that Skokic had extreme limitations in her abilities to initiate

and complete tasks in a timely manner, ignore or avoid distractions, sustain an ordinary routine

and regular attendance, use reason and judgment to make work-related decisions, understand and

learn terms and instructions, work a full day without needing more than the allotted number or

length of rest periods, regulate emotions and control behavior in a work setting, keep social

interactions free of excessive irritability or argumentativeness, and respond appropriately to

requests or criticism.   (Tr. 654-56.)   She found that Skokic had marked limitations in her

abilities to follow one or two-step oral instructions to carry out a task, function independently,

distinguish between acceptable and unacceptable work performance, ask simple questions or

request help, and maintain socially acceptable behavior.   *Id.*   Ms. Santinanavat found that

Skokic's overall pace of production performing simple tasks in a low-stress environment would

be 31 percent or more below average; and she would miss work three times a month or more due

to her psychologically-based symptoms.   (Tr. 654-55.)   Ms. Santinanavat further found that

Skokic could not perform in proximity to coworkers without being distracted by them or without

distracting them due to exhibition of abnormal behavior; could not consistently perform for

superiors without exhibiting insubordinate behavior in response to supervision; and could not

perform in a setting with any contact with the general public.   (Tr. 656.)   She expressed the

opinion that the limitations assessed existed beginning in 2016.   (Tr. 657.)

The ALJ first noted that Ms. Santinanavat is not an acceptable medical source under the

relevant regulations, yet she fully considered her statement in determining the severity of

Skokic's impairments and their effect on her ability to function.   (Tr. 701.)   She then stated that

she was assigning "little weight" to Ms. Santinanavat's opinion because "the severity of the

limitations opined are not consistent with the record."   *Id.*   She stated that Skokic's major

depressive disorder and PTSD "have caused no more than moderate limitations."   *Id.*   The ALJ

then provided the identical explanation[10] as that provided for discrediting Dr. Marcu's opinion.

(Tr. 701-02.)

Ms. Santinanavat's treatment notes are summarized below:

On June 28, 2018, Skokic presented to Ms. Santinanavat at Psych Care Consultants for an

evaluation upon the referral of Dr. Marcu.   (Tr. 661.)   Skokic indicated that she had suffered

from depression since the Bosnian war.   *Id.*   Both of her parents and her two siblings were

---

[10] The ALJ's explanation was that Skokic was consistently alert and oriented, demonstrated average intelligence and fund of knowledge, routinely had a normal memory, had a normal affect and mood at times, was well engaged, occasionally had intact attention and concentrations, had not sought inpatient or emergency mental health treatment, denied having suicidal or homicidal ideations on a few occasions, routinely denied auditory or visual hallucinations, had a logical and goal directed thought process on a few occasions, and consistently demonstrated good insight and judgment.   (Tr. 700-01, discussion of Dr. Marcu's opinion; and Tr. 701-02, discussion of Ms. Santinanavat's opinion.)

killed during the war.   *Id.*   She had seen different psychiatrists in the fifteen years she had been

in the United States.   *Id.*   Skokic was fired from her last job as a CNA in 2016 due to her

depression, panic attacks, and difficulty getting along with others.   *Id.*   Her depression has been

worse since then.   *Id.*   Skokic's panic attacks are so bad that she has not driven in two years.

*Id.*   She isolates and stays home, her sleep is poor, she has no energy or motivation, feels

hopeless, cannot make decisions, has nightmares daily, has frequent crying spells, has no friends,

and has marital problems.   *Id.*   Upon examination, Skokic exhibited poor eye contact; was

guarded; her mood was anxious and depressed; her affect was constricted; her speech was soft

and delayed; her thought content was notable for helplessness, low self-worth, and hopelessness;

her concentration was impaired; her judgment was mildly impaired; and her insight was fair.

(Tr. 662.)

 On July 3, 2018, Skokic's daughter brought her to see Ms. Santinanavat.   (Tr. 665.)

Skokic remained "very depressed," and felt like she has no one, as her entire family was killed

in the war.   *Id.*   She reported crying spells, poor memory and concentration, panic attacks, and

inability to make decisions.   *Id.*   Skokic indicated that she wanted to leave her husband but

knows she could not take care of herself, so she feels very helpless.   *Id.*   On examination, she

exhibited poor eye contact, was cooperative, her mood was anxious and depressed, and her affect

was flat.   *Id.*

Ms. Santinanavat completed her statement two days later, on July 5, 2018.   In her

statement, Ms. Santinanavat indicated that her opinion was based upon the following objective

signs and symptoms displayed by Skokic: daily crying spells, memories of her siblings being

shot to death by soldiers, trauma from being raped when she was in the war camp, poor sleep,

severe anhedonia, fatigue, isolation, no motivation, poor memory, poor concentration, and

inability to make decisions.   (Tr. 657.)   When asked about any other reasons Skokic may have difficulty working on a full-time sustained basis, Ms. Santinanavat responded: "her depression and trauma from the war affected her ability to function.   She tried her best to work, raised 2 children after moving here."   *Id.*   She further noted that Skokic was fired from two jobs because she became emotional and agitated and was unable to function.   *Id.*   Ms. Santinanavat stated that Skokic stopped driving due to increased panic and anxiety, and experiences severe isolation and withdrawal.   *Id.*

On July 24, 2018, Skokic remained very depressed and severely isolated.   (Tr. 667.)   On August 16, 2018, Skokic reported that she had moved out of her apartment and was staying with her daughter because she could no longer tolerate her husband's verbal abuse.   (Tr. 670.)   She continued to have daily crying spells, poor sleep, extreme fatigue, poor memory, and feelings of helplessness.   *Id.*   Skokic would like to return to work someday to have a purpose in her life and felt ashamed that she could no longer work.   *Id.*   The following month, Skokic reported that she remained very depressed.   (Tr. 1065.)   She tried to get out of the apartment and walk to the end of the street, but her anxiety and fear cause her to return to the apartment to be safe.   *Id.*   In November 2018, Skokic was "severely depressed," and exhibited severe anhedonia and crying spells.   (Tr. 1069.)   She does not leave the apartment except for doctor appointments and relies on her daughter for everything, including transportation.   *Id.*   Skokic denied suicidal ideation, but stated that she "would not care if she is not here."   *Id.*   Skokic saw Ms. Santinanavat on January 8, 2019, at which time she remained very depressed.   (Tr. 1071.)   She lives in isolation and does not interact with anyone.   *Id.*   She has vague death wishes but no intent or plan.   *Id.* Skokic saw Ms. Santinanavat on February 28, 2019, at which time she remained significantly

depressed.   (Tr. 1073.)   She did not get out of bed except when her daughter gets home from work.   *Id.*

As the ALJ noted, Ms. Santinanavat, as a licensed clinical social worker, is considered an "other source" under the relevant regulations.   *See* 20 C.F.R. §404.1513(d).   Opinions of other sources are not entitled to controlling weight.   *LaCroix v. Barnhart*, 465 F.3d 881, 885-86 (8th Cir. 2006).   "[I]nformation from such 'other sources,' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."   *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (quoting 20 C.F.R. § 404.1513(d)).   "Evidence provided by 'other sources' must be considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record."   *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015); *see also Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (in determining what weight to give to other evidence, the ALJ has more discretion and is permitted to consider any inconsistencies found within the record).

The ALJ failed to offer "good reasons" for assigning little weight to Ms. Santinanavat's opinion.   The ALJ provided the identical rationale for discrediting Ms. Santinanavat's opinion that she provided for assigning little weight to Dr. Marcu's opinion.   As previously discussed, the normal findings on examination set out by the ALJ are not inconsistent with Dr. Marcu's opinion.   As such, this evidence does not support discrediting Ms. Santinanavat's opinion. Further, Ms. Santinanavat provided a detailed explanation for the limitations she found, and her explanation is consistent with her treatment notes.   For example, Ms. Santinanavat's treatment note document the trauma Skokic experienced in the Bosnian war and her resulting PTSD

symptoms, her poor memory and concentration, and her severe isolation due to depression.   The

ALJ did not address Ms. Santinanavat's cited rationale for her opinion.

The only other opinion in the record is that of state agency psychological consultant

Steven Akeson, Psy.D.   (Tr. 56-58.)   Dr. Akeson completed a Mental Residual Functional

Capacity Assessment on February 2, 2017.   *Id.*   Dr. Akeson found that Skokic had moderate

limitations in the following abilities: carry out detailed instructions, maintain attention and

concentration for extended periods, and interact appropriately with the general public.   (Tr. 57.)

He expressed the opinion that Skokic was capable of at least sustaining with simple, routine tasks

in jobs that are away from the public.   (Tr. 58.)

The ALJ accorded "significant weight" to Dr. Akeson's opinion, although she noted that

the record was "also consistent with moderate limitations in the claimant's ability to adapt or

manage herself."   (Tr. 700.)   The ALJ stated that Skokic has not sought inpatient or emergency

mental health treatment, and was treated conservatively with therapy and medication.   *Id.*

It is well established that opinions of non-examining sources are generally given less

weight than those of examining sources, *Willcockson v. Astrue,* 540 F.3d 878, 880 (8th Cir.

2008); and that when weighing the opinion of a non-examining source, the ALJ must evaluate

the degree to which the source considered all of the pertinent evidence.   20 C.F.R. §§

404.1527(c)(3), 416.927(c)(3).

Here, the only explanation Dr. Akeson provided for his opinion was that there was no

report of inpatient psychiatric treatment "or treatment by a mental health professional."   (Tr.

58.)   It is true Skokic has never been hospitalized for her psychiatric impairments, but she has

received extensive mental health treatment as set out above.   A claimant need not be

hospitalized to establish the presence of a disabling psychiatric impairment.   Dr. Akeson's

opinion, rendered in February of 2017, pre-dated Skokic's psychiatric treatment at SLUCare and her counseling with Ms. Santinanavat.   On the one hand, the September 1, 2010, alleged onset of disability date made Dr. Akeson's 2017 opinion relevant to the determination of whether Skokic had a disabling condition between September 2010 and the date of his opinion.   On the other hand, giving the opinions of Skokic's mental health treating sources only little weight resulted in formulation of a mental RFC that did not account for the mental limitations experienced by Skokic during the latter part of the alleged period of disability.   The ALJ's treatment of Dr. Marcu's and Ms. Santinanavat's opinions runs afoul of the general rule that opinions of non-examining sources are generally given less weight than those of examining sources.

In sum, the ALJ erred in evaluating the medical opinion evidence.   As a result, the mental RFC formulated by the ALJ lacks the support of substantial evidence.   That said, it is worth noting that the narrowing of the issues related to Skokic's physical and mental impairments through the appellate process over the past dozen years has cast doubt on Skokic's alleged onset of disability date.

## Conclusion

For the reasons discussed above, the Commissioner's decision is not based upon substantial evidence on the record as a whole and the cause is therefore remanded to the Commissioner for further consideration in accordance with this Memorandum and Order.   Upon remand, the ALJ shall properly consider Skokic's subjective complaints, accord proper weight to the opinions of Dr. Marcu and Ms. Santinanavat, and formulate an RFC supported by substantial evidence.   The ALJ must also obtain additional evidence, if necessary, including "call[ing] upon the services of a medical expert, to assist with inferring the date that the claimant first met the

statutory definition of disability" pursuant to Social Security Ruling 18-01p.[11]   *See Heckler v. Edwards*, 465 U.S. 870, 873 (1984) (Noting that, although Social Security Rulings do not have the force of law, they are binding on "all components of the Social Security Administration.").


/**s**/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2022.

---

[11] SSR 18-01p rescinds and replaces SSR 83-20, "Titles II and XVI: Onset of Disability."   SSR 18-01p, 2018 WL 4945639.   (Effective October 2, 2018.)   The 1983 version of the Ruling instructed that "[t]he onset of disability date is the first day an individual is disabled as defined in the Act and the regulations…   However, the individual's allegation or the date of work stoppage is significant in determining onset *only if it is consistent with the severity of the condition(s) shown by the medical evidence*."   *See Title II & Xvi: Onset of Disability*, SSR 83-20 (S.S.A. 1983) (Emphasis supplied.).